Accordingly, the Administrator finds that since the Provider's March 23 exception request was initially incomplete and the Provider failed to submit supporting documentation within the appropriate time frames, the Board's decision remanding the case to HCFA for a decision on the merits is reversed.

*DECISION*

The decision of the Provider Reimbursement Review Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES

Date:*01/02/01*

---

[¶ 80,644]    **Hemet Valley Medical Center v. Blue Cross Blue Shield/Blue Cross of California.**

*HCFA Administrator Decision,* Jan. 19, 2001.

### Medicare: Bad Debts, Charity and Courtesy Allowances

**Provider reimbursement—Bad debts—Reasonable collection efforts.**—The Provider Reimbursement Review Board lacked jurisdiction where the provider failed to properly claim the costs at issue. The intermediary's final determination, therefore, did not reflect the adjustment the provider had appealed. Furthermore, based on the merits of the case the bad debts the provider claimed were not allowable. The record contained a list of bad debt accounts without supporting documentation detailing the steps taken to recover the alleged bad debts. Thus, the record did not support a finding that reasonable collection efforts were made by the provider.

See ¶ 5233.

**PRRB Dec. No. 2001-D5 (GUIDE ¶ 80,635) is modified.**

**[Text of Decision]**

This case is before the Administrator, Health Care Financing Administration (HCFA), for review of the decision rendered by the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (Act), as amended [42 USC 1395oo(f)]. The Intermediary requested review of the Board's decision. Subsequently, the parties were notified of the Administrator's intention to review the Board's decision, and the Provider commented. Accordingly, the case is now before the Administrator for final administrative decision.

*ISSUE AND BOARD'S DECISION*

The issue is whether the Intermediary's determination of the Provider's inpatient and outpatient Medicare bad debts was proper.

The Board found that the main issue to be decided concerned the timeliness of the bad debt accounts associated with the collection agencies' listings for the Provider's fiscal year ending (FYE) 06/30/94. The Board stated that the Provider followed the Intermediary's rule that a debt must be returned from the collection agency in order to be claimed as a Medicare bad debt. Although the Intermediary denied the claims as " 'too old,' " the Board found that there was no rule, in the bad debt regulations at 42 CFR 413.80, defining when a debt must be returned from a collection agency. The Board

found that, in current years, the Intermediary had reimbursed bad debts based on the return of accounts from the collection agencies. Thus, the Board found "that the same recognition must be given to the bad debt listings submitted for the FYE June 30, 1994."

Moreover, based on the evidence, the Board found that the only bad debt accounts returned by the collection agencies in FY 1994, and not previously considered by the Intermediary, were those referred to the agencies in FYEs 06/30/93 and 06/30/94. The Board found that these bad debts, totaling $56,829.08, should have been reimbursed by the Intermediary, and modified the Intermediary's adjustment accordingly.

*SUMMARY OF COMMENTS*

The Intermediary requested review of the Board's decision because the Board overlooked the difference in a collection agency contract between treatment of Medicare accounts versus treatment of non-Medicare accounts. In violation of §310 of the Provider Reimbursement Manual (PRM), paragraph 5(I) of the contract[1] stated that, in contrast to non-Medicare bad debts, Medicare accounts would not be listed with a credit bureau, and that no legal action would be filed against Medicare debtors " 'unless specified by the Client.' " Thus, the Intermediary requested that the Administrator reverse the Board's granting of the reimbursement totaling $56,829.08 for FYE 06/30/94 due

---

[1] *See Intermediary Exhibit No. 2.*

**¶ 80,644**

©2001, CCH INCORPORATED

EXHIBIT ___1___



to disparate treatment of Medicare and non-Medicare accounts.

The Provider requested affirmance of the Board's decision, stressing that the Intermediary failed to prove that the Provider, *in practice*, treated Medicare accounts differently than non-Medicare accounts. The Provider observed that one of the contracts with one of the agencies "contains a limit on the number of notices and telephone calls that the collection agency would make to Medicare patients, and states that Medicare accounts would not be placed with a credit agency and would not be the subject of legal action." The Provider noted that the Intermediary did not base its audit adjustments on this contract provision, but rather first invoked the argument in its fiscal supplemental position paper, filed a week before the Board hearing. There was no evidence in the record to support the Intermediary's contention that the Provider in fact practiced the specialized treatment of Medicare accounts required in the contract. Testimony from the hearing indicated that the Intermediary's witness did not know whether the collection agency treated Medicare accounts differently than non-Medicare accounts. Moreover, the Provider disputed the Intermediary's contention that the Board overlooked its disparate treatment argument, and observed that the Board's decision noted the Intermediary's argument in the " 'Parties' Contentions' " area of the decision.

### DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments received timely are included in the record and have been considered.

Section 1878(a) of the Act sets forth the requirements for Board jurisdiction. A provider may obtain a hearing before the Board with respect to its fiscal intermediary's determination of its cost report, *inter alia*, only if the provider is *dissatisfied* with a final determination of its fiscal intermediary as to the amount of reimbursement due to the provider for the period covered by such report; there is $10,000 or more in controversy; and the provider filed a request for a hearing within 180 days after the notice of the intermediary's final determination.

With respect to the first criteria for Board jurisdiction, the U.S. Supreme Court in *Bethesda Hospital Association v. Bowen*[2] stated that "the submission of a cost report in full compliance with the unambiguous dictates of

the Secretary's rules and regulations does not, by itself, bar the provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations."[3] However, the Supreme Court recognized the distinction between a provider that self-disallowed a claim pursuant to a Medicare regulation that it intended to challenge before the Board and a provider that failed to claim all reimbursement it was entitled to under the regulations. The Court stated, with respect to the provider in *Bethesda*, that:

> Thus, petitioners stand on different grounds than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules. While such defaults might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary, those circumstances are not presented here.

This language in *Bethesda* strongly suggest that a hospital that does not ask its intermediary to reimburse it for all of the costs for which it is entitled to be reimbursed cannot, on appeal to the Board, first ask for new costs.

In this case, the Audit Adjustment Report[4] in the Intermediary's notice of program reimbursement (NPR) records $96,326 "as reported" under "reimbursable bad debts," with an Intermediary disallowance of that entire amount. The next line states the following:

All other

> To adjust the Medi/Medi Crossover bad debts claimed to agree with the providers' bad debt listing & related supporting documentations. To disallow the Medicare bad debts (Part A & B) claimed since the bad debt listing indicates that these bad debt accounts are 10 yrs. old & prior and that provider had no indication that these were claimed in prior years. HCFA Pub 15-1 Sec.304[,] 42[]CFR 413.80....[5]

The "as reported" column to the right of the above paragraph lists $528,272, the "increase/decrease" column states -$34,446, and the "as adjusted" column reports $493,826, i.e., the Intermediary allowed reimbursement for almost all of the bad debts claimed in the second entry. Yet, the Provider has consistently argued throughout this case that it was entitled to approximately $474,676 in bad debt reimbursement. This figure is inconsistent with both of the "as reported" figures of $96,326 and $528,272, and the Provider has not explained the discrep-

---

[2] 485 US 399 (1988).

[3] The Supreme Court in *Bethesda* addressed the issue of "dissatisfaction" as set forth in § 1878 of the Act. The provider in *Bethesda* "self disallowed" certain claims on the cost report submitted to its intermediary, in order to comply

with a Medicare regulation that it intended to challenge before the Board.

[4] *See* Provider Exhibit 5.

[5] *Id.*

EXHIBIT _1_

ancy. Thus, the Provider has not met the first requirement in Board jurisdiction: i.e., that of dissatisfaction with a final determination of its fiscal intermediary as to the amount of reimbursement due to the provider for the FYE 06/30/94 cost year. Rather, the Provider apparently failed to claim the costs at issue for reimbursement in the first instance; thus, there was no adjustment reflected on the final determination (i.e., the NPR) to be appealed. Furthermore, there appears to be no self-disallowance in this case which was invoked in *Bethesda*, i.e., the Provider has not claimed that it was fruitless to ask for the reimbursement of the bad debts at issue on the cost report. Thus, as the Provider cannot demonstrate "dissatisfaction" with respect to the $474,676 at issue, the Board did not properly have jurisdiction in this case.

Even assuming the Board properly found jurisdiction over the Medicare bad debt claim of $474,676.61 presented by the Provider during audit, after filing the cost report, the Administrator finds that the bad debts at issue are not allowable. Medicare regulations provide at 42 CFR 413.80(a) that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program.[6] Bad debts are defined at § 413.80(b)(1) as:

> amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable"... are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

Section 413.80(d) of the regulations states that payment for deductibles and coinsurance amounts are the responsibility of the beneficiaries. However, recognizing the reasonable cost principle of § 1861(v)(1)(A) of the Social Security Act, prohibiting cross-subsidization, the program acknowledges that the inability of providers to collect deductibles and coinsurance amounts from Medicare beneficiaries could result in part of the costs of Medicare-covered services being borne by non-Medicare beneficiaries. To prevent such cross-subsidization, Medicare pays providers for allowable bad debts.

Section 413.80(e) lists the criteria for Medicare reimbursement of bad debts:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.[7]

The reasonable collection effort requirement of § 413.80(e)(2) is explained in § 310 of the PRM:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients....

A. *Collection Agencies.*—A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, followup letters, telephone, and personal contacts.[8] Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. The "like amount" requirement may include uncollected charges above a specified minimum amount. Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency.

B. *Documentation Required.*—*The provider's collection effort must be documented in the patient's file by copies of the bill(s), followup letters, /reports of telephone and personal contact, etc.*[9] [Emphasis added.]

Providers are also required to maintain supporting documentation for their reimbursement claims. The regulation at 413.20 states that:

> The principles of cost reimbursement require that providers *maintain sufficient financial records and statistical data* for proper determination of costs payable under the program.... Essentially, the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and proper pay-

---

[6] *See also* § 304 of the PRM.

[7] *Id.* at § 308 of the PRM.

[8] The Provider has indicated that internal collection efforts were made prior to referral to collection agencies. *See*

Provider Exhibit 18, Provider Position Paper, and Provider's Post-Hearing Brief.

[9] Transmittal No. 278 (January 1983), effective for cost reporting periods beginning January 14, 1983.

**¶ 80,644**

©2001, CCH INCORPORATED

ment for services to beneficiaries [Emphasis added.]

Moreover, § 413.24(a) requires that reimbursement claims must be supported by "adequate cost data" based on "financial and statistical records which *must be capable of verification by qualified auditors*" [emphasis added].

In regard to when a provider may include a bad debt on a Medicare cost report, § 413.80(f) relates that:

> The amounts uncollectible from specific beneficiaries are to be charged off as bad debts in the accounting period in which the accounts are deemed to be worthless. In some cases an amount previously written off as a bad debt and allocated to the program may be recovered in a subsequent accounting period; in such cases the income therefrom must be used to reduce the cost of beneficiary services for the period in which the collection is made. [Emphasis added.][10]

Moreover, § 310.2 of the PRM explains Medicare's "presumption of noncollectibility" as follows:

> If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.[11]

Section 316 of the PRM addresses the situation where debts previously written off are subsequently recovered:

> Amounts included in allowable bad debts in a prior period might be recovered in a later reporting period. Treatment of such recoveries under the program is designed to achieve the same effect upon reimbursement as in the case where the amount was uncollectible.

> When the provider was reimbursed by the program for bad debts for the reporting period in which the amount recovered was included in allowable bad debts, reimbursable costs in the period of recovery are reduced by the amounts recovered. However, such reductions in reimbursable costs should not exceed the bad debts reimbursed for the applicable prior period.

In this case, the Provider has argued that over a thousand line items listed on an exhibit,[12] represent bad debts which were "returned" from

its collection agencies during FYE 07/01/93 to 06/30/94. The fact that they were returned, the Provider claims, indicates that they were worthless accounts properly presented for Medicare reimbursement. The exhibit reflects that dates of inpatient and outpatient services for these claims were from 1985 to 1992. Recovery/partial recovery of some debts are also listed on the report.[13] The Provider has stated that the Intermediary informed it of a new policy during its FYE 06/30/93 audit—that accounts referred to a collection agency could not be claimed as worthless until the collection agency returned the account to the Provider.[14]

During the Intermediary's audit, the Provider presented additional bad debt claims. The Intermediary concluded that these debts, which were for services performed as long ago as nine years prior to FYE 06/30/94, were "worthless" long before they were claimed. Before the Board, the Intermediary observed that it defied "common sense" for the Provider to suggest that it had actively pursued these claims with "reasonable collection efforts" for as long as nine years, internally and then with collection agencies, then deemed them worthless. Thus, the Intermediary argued that the claims should be disallowed for noncompliance with § 413.80(f) of the regulations, which requires that a bad debt be "charged off" in the cost reporting period in which they are deemed to be "worthless."

Prior to and at the hearing, the Intermediary further argued that the claims are not allowable because a contract between the Provider and one of its collection agencies indicates that Medicare debts were not treated with the same level of collection effort spent on non-Medicare accounts, in violation of § 310 of the PRM.

Applying the above law to the facts of this case, the Administrator finds that the Provider has failed its burden of proof. As noted above, the Board's decision finds that there was sufficient evidence in the record to support the Provider's claims for bad debts which were: a) not previously considered by the Intermediary in earlier fiscal years; b) referred to the agencies in FY 1993 and 1994; and c) returned by the agencies in FY 1994. However, the Administrator finds inadequate evidence in the record to support Medicare reimbursement of any of the bad debts claimed in this case. The record merely contains lists of bad debt accounts, with no supporting documentation.

---

[10] *See also* § 314 of the PRM.

[11] The Provider stated that it was claiming the debts under the 120-day rule, *see* Provider's Post-Hearing Brief at 9.

[12] *See* Provider Exhibit 13. The Intermediary claims that there are 1750 line items in this exhibit (each representing a bad debt). The Provider acknowledged in its post-hearing

brief (p. 14) that some of these debts were paid in prior years, approximately $42,462 of debts. *See also* Provider Exhibit 15.

[13] *Id.* The column which the Provider claims lists any recoveries is entitled, "BD payment/BD pay dte."

[14] *See* Provider's Position Paper of Sep. 15, 1998.

28

EXHIBIT ___|___

As outlined above, the regulations at § 413.80(e) sets forth requirements for reimbursement which the Provider must demonstrate have been met. The requirements include the provider establishing that reasonable collection efforts were made, that the debt was actually uncollectible when claimed as worthless, and that sound business judgment indicates that recovery of the claim was not likely. The documentation in the patient's file, required at § 310B of the PRM, must include copies of bills, follow-up letters, and reports of contacts with the individuals responsible for the debt. Furthermore, the regulations at § § 413.20 and 413.24, as noted above, applicable to all claims for Medicare reimbursement, require the provider to maintain sufficient financial and statistical data, capable of verification. The record is devoid of evidence of reasonable collection efforts except for a listing of debts and verbal statements made at the hearing. Neither a list nor verbal testimony alone is capable of verification without supporting documentation. The record does not show the steps taken for recovery of the debts, from date of first billing to the time when the debt was deemed worthless. Since there are no copies of bills, contacts with the debtor, or any other written documentation of the actual efforts made by the Provider to recover the debts, the record does not support a finding that a reasonable collection effort was made to collect the Medicare debts.[15]

In addition, § 310 of the PRM also states that the collection efforts for Medicare accounts must be "similar" to those spent on comparable non-Medicare accounts. The evidence shows that the Provider's contract with one of the two collection agencies it used, Premium Collection Service, allowed for disparate treatment of Medicare and non-Medicare claims.[16] The following excerpts from the contract are relevant to whether the Provider in this case has complied with the requirement for similar collection efforts for Medicare and non-Medicare accounts:

5 ... B. Make demand for payment by phone and send notice of account assigned for collection to patient/guarantor....

E. List all patients/guarantors with TRW CREDIT DATA, upon Client approval.

F. We will bring forth suit actions against patient/guarantor on those who refuse to pay....

I. *When working the Medicare accounts*, the collector will mail three (3) notices, make two (2) telephone calls to patient, and if no response, the account will be suspended. Medicare accounts will not be placed on TRW CREDIT DATA, and no legal action will be filed, unless specified by the Client [Provider]. [Emphasis added.]

The Administrator observes that the listing at the Provider's Exhibit F does not identify which accounts were forwarded to which collection agency. Thus, it is impossible to determine how much of the amount at issue was subject to the disparate treatment of Medicare accounts in contrast to non-Medicare accounts, as clearly contemplated by the above contract excerpt. The Provider, throughout the hearing process, had the opportunity to present evidence of the amount of claims covered by the Premium contract, but did not do so; thus, the Provider failed to meet its burden of proof with respect to the disparate treatment of Medicare and non-Medicare claims.

Accordingly, the Administrator finds that the Board's decision was unsupported by the record, and must be modified to disallow the $56,829.08, which the Board granted, and to affirm the Board's disallowance of the Intermediary's refusal to reimburse the remaining claims requested by the Provider for FYE 06/30/94.[17]

### DECISION

The decision of the Provider Reimbursement Review Board is modified in accordance with the foregoing opinion.

---

[15] Moreover, as noted by the Board, the record indicates that most of the bad debts had been claimed and denied in earlier years.

[16] The evidence reflects that the contract was signed by the Provider and the Agency in February 1988. Paragraph 15 of the contract states that it will be "in effect for one year from the date hereon," and "automatically renewed from year to year" unless terminated in writing by one of the parties. *See* Intermediary Exhibit 2. The Provider stated that it used two collection agencies in the FY at issue. *See* Provider's Post-Hearing Brief at 7.

[17] The Provider argued (*see* Provider's Post-Hearing Brief at 15-16 and Provider Exhibit 15) that, in prior years, the Intermediary allowed bad debts similar to those in the instant case. However, that argument is not a basis for the Administrator to reverse the Intermediary's disallowance in this case. The Administrator notes that the Provider has not demonstrated the applicability of the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 (OBRA of 1987) Moratorium, amended by section 8402 of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, and section 6023 of OBRA of 1989, Pub. L. No. 101-239. There is no evidence in the record indicating the Provider's actual collection efforts (and precisely what evidence was considered acceptable) in years past, and, it appears that the Provider has not advanced the Moratorium argument *per se*. Thus, the Moratorium is not applicable in this case.

**¶ 80,644**

©2001, CCH INCORPORATED

EXHIBIT 1

THIS CONSTITUTES THE FINAL AD-
MINISTRATIVE DECISION OF THE SEC-
RETARY OF HEALTH AND HUMAN
SERVICES

[¶ 80,645]   Francis A. Bell Memorial Hospital v. Shalala.

*HCFA Administrator Order*, Dec. 5, 2000.

### Medicare: Appeals

**Provider appeals—Judicial review—Remand to PRRB as reviewable decision.**—Based on the remand order of the U.S. District Court for the Western District of Michigan, the provider's claims relating to the payment of interest were remanded to the Provider Reimbursement Review Board (PRRB). Because the district court ordered that the Secretary issue its final determination within nine months of the remand date, the PRRB's decision must be issued by May 15, 2001.

See ¶ 7725.70.

#### [Text of Order]

The United States District Court for the Western District of Michigan, by order dated October 30, 2000, remanded the claims relating to the payment of interest under 42 U.S.C. § 1395g(d) of Francis A. Bell Memorial Hospital, which was a party in the case of *Francis A. Bell v. Shalala*, Case No. 2:99-CV-226, for further proceedings consistent with its order.

Accordingly, the Administrator orders:

1) That this case be remanded to the PRRB for further proceedings consistent with the order of the District Court, and

2) That the Board issue its decision by May 15, 2001 as the Court ordered that the Secretary issue its final determination within nine months of the date of the remand, and

3) That the decision of the PRRB is subject to all applicable statutes and regulations, including but not limited to Section 1878(f)(1) of the Social Security Act [42 U.S.C. § 1395oo] and 42 C.F.R. § 405.1875 and 405.1877.

*Date: 12/5/00*

[¶ 80,646]   Sarasota Palms Hospitals v. Shalala.

*HCFA Administrator Order*, Dec. 8, 2000.

### Medicare: TEFRA Target Rate Exception

**Provider reimbursement—Limitations on reimbursable costs—Ceiling on hospital rate of cost increases.**—As ordered by the district court, the provider's claim has been remanded to HCFA to calculate the amount due to the provider pursuant to its requests for adjustments to its Tax Equity and Fiscal Responsibility Act of 1982 (PubLNo 97-248) (TEFRA) target amounts for fiscal years 1988, 1989 and 1990. The provider, a mental hospital, was entitled to an adjustment to its TEFRA amount due to the imposition of the Florida Indigent Care Tax.

See ¶ 7531M.

**HCFA Admin. Dec., Dec. 8, 2000 (1999-1 Transfer Binder ¶ 80,196) is remanded.**

#### [Text of Order]

PRRB CASE NO. 99-D23

CASE NO.: 99-1399-CIV-T-23C

FILED: SEPT. 28, 2000

The United States District Court for the Middle District of Florida, by order dated September 28, 2000, remanded the above case to the Health Care Financing Administration (HCFA) for calculating the amount due to the Provider

pursuant to its request for adjustments to its TEFRA target amounts for fiscal years ending May 31, 1988, May 31, 1989 and May 31, 1990.

Accordingly, the Administrator remands this case to HCFA and orders:

That, on remand, HCFA (or, if HCFA determines appropriate, the Intermediary), shall calculate the the Provider's TEFRA target amount consistent with the order of the district court.

EXHIBIT  1

As reflected in the above *Federal Registers*, all published prior to the issuance of the NPRs at issue in this case, HCFA had given providers more than sufficient notice of the following: the methodology to be used for each fiscal year; the threshold or target for each year; the data used in calculating the threshold; and, most importantly, that HCFA would make no retroactive adjustments for underpayments or overpayments. In addition, providers were on notice, for the FY at issue, as to the effect of continuing decrease of LOS on the actual payments and that HCFA only expected that the actual payments would be "closer" to the target.[18]

The NPRs at issue in this case were issued in 1988 and 1989, well after HCFA's various statements concerning the no retroactive adjustment rule generally, and after the various PPS rules

were published setting forth the applicable methodology and thresholds for the cost years in question. Consequently, the Administrator reverses the Board's granting of good cause for FYE December 31, 1986 for Buffalo General Hospital and Lenox Hill Hospital.

### DECISION

The Board's decision granting of good cause for late filing for Buffalo General Hospital and Lenox Hill Hospital FYE December 31, 1986 is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES

---

**[¶ 80,415]  Good Shepherd Medical Center (Longview, Tex.) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Texas**

*HCFA Administrator Decision*, Feb. 4, 2000.

### Medicare: Home Health Agencies

**Provider reimbursement—Allowable costs—Distribution of general service costs to nonallowable cost centers.**—The PRRB did not have jurisdiction to accept a stipulated agreement in which a home health agency (HHA) and its intermediary agreed to the proper allocation of cafeteria and administrative costs. The HHA failed to raise either matter on its original list of issues and was unable to demonstrate that it met the dissatisfaction requirement for Board jurisdiction. The issues in dispute did not involve any dissatisfaction with an action taken by the intermediary with respect to the HHA's cost report, but rather involves the HHA's dissatisfaction with how it claimed certain costs on its cost report. Accordingly, the jurisdictional decision of the PRRB was reversed and the HHA's cafeteria and administrative cost issues were dismissed.

See ¶ 4268.51, ¶ 6671.

**PRRB Dec. No. 2000-D7 (1999-2 Transfer Binder ¶ 80,382) is reversed.**

### [Text of Decision]

**HEALTH CARE FINANCING ADMINISTRATION**

*Decision of the Administrator*

**In the case of: GOOD SHEPHERD MEDICAL CENTER Provider vs. BLUE CROSS AND BLUE SHIELD ASSOCIATION/BLUE CROSS AND BLUE SHIELD OF TEXAS Intermediary**

**Claim for:**

**Provider Cost Reimbursement Costs for Cost Reporting**

**Period Ending: 09/30/91**

**Review of:**

**PRRB Decision No. 2000-D7**

**Dated: December 2, 1999**

This case is before the Administrator, Health Care Financing Administration (HCFA), for review of the decision entered by the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (Act), as amended [42 USC 1395oo(f)]. The parties were notified of the Administrator's intention to review the Board's decision. Comments were received from the Intermediary and the Provider. Accordingly, the case is now before the Administrator for final administrative decision.

### ISSUE AND BOARD'S DECISION

The Issue before the Administrator is whether the Board properly found jurisdiction over the home health agency (HHA) cafeteria cost allocation issue and the HHA administrative cost issue.[1]

---

[18] The Providers also failed to acknowledge their own payment experience for those years. Finally, the Administrator notes that other similarly situated providers have appealed timely.

[1] Pursuant to 42 CFR 405.1875, the Administrator may review any final decision of the Board including a decision under 405.1873 about Board jurisdiction to grant a hearing.

**¶ 80,415**

EXHIBIT ___*1*___

10.

First, the Board found that it had jurisdiction over the disputed issues based on its jurisdictional decision of April 1, 1999. The Board stated that the Provider included the other disputed costs in its cost report. Therefore, the issues are a matter covered by the cost report as required by 42 U.S.C. § 1395oo(a)(1)(A)(i). The Board also found that the Provider appealed the two issues in accordance with 42 C.F.R. § 405.1841(a)(1), which allows a provider, before the commencement of hearing proceedings, to identify additional aspects of the intermediary's determination with which it is dissatisfied. The Board, therefore, found it had jurisdiction over the two disputed issues remaining in the Provider's appeal.

Next, the Board found that there was a stipulation agreed to by both parties, which addressed both of the merits of the disputed issues. Therefore, based on the stipulation agreement, the Board order both parties to enforce the stipulation and directed the Intermediary to make the appropriate adjustments in compliance with the stipulation agreement.

## SUMMARY OF COMMENTS

The Intermediary commented that the Board had no jurisdiction over the disputed issues because the Board only has jurisdiction over final determinations of the Intermediary. Furthermore, the Intermediary stated that an issue does not arise just because a hospital eventually finds a matter on a cost report schedule or worksheet that, with hindsight, it wished it had submitted differently. The only exception to the dissatisfaction requirement for Board jurisdiction being based reflected by an adverse intermediary finding would be a narrowly defined "self-disallowed" adjustment which is not applicable in this case. Finally, the Intermediary stated that the Administrator should adhere to the reasoning in *Little Company of Mary*[2] and *Conemaugh Memorial Hospital*[3], since the issues are nothing more than the self discovery of cost reporting errors which cannot be bootstrapped onto a provider's pending appeal.

The Provider commented stating that the Board obtained jurisdiction over the 1991 fiscal year cost report, by virtue of the Provider's timely appealing the Intermediary's notice of program reimbursement (NPR). Thus, the Board's scope of review included all matters covered by that cost report, regardless of

whether the specific issue had been raised with the Intermediary. In this case, the HHA cafeteria costs and the HHA administrative costs were included in its 1991 cost report.[4] Therefore the disputed issues are within the Board's scope of review and the Board's decision should be affirmed. In addition, the Provider stated that the Board had jurisdiction over the disputed issues because the Provider was "dissatisfied with a final determination" made by its fiscal intermediary. In this case, the Provider argued that it was "dissatisfied with the total amount of reimbursement" reflected in the NPR issued by the Intermediary on September 3, 1993 and thus Board jurisdiction over these issues was proper.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments received timely are included in the record and have been considered.

Section 1878(a) of the Act sets forth the requirements for Board jurisdiction. A provider may obtain a hearing before the Board with respect to its fiscal intermediary's determination of its cost report, *inter alia*, only if: The provider is *dissatisfied* with a final determination of its fiscal intermediary as to the amount of reimbursement due to the provider for the period covered by such report; there is $10,000 or more in controversy; and the provider filed a request for a hearing within 180 days after the notice of the intermediary's final determination.[5]

With respect to the first criteria for Board jurisdiction, the Supreme Court in *Bethesda*[6] stated that "the submission of a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations does not, by itself, bar the provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations."[7] However, the Supreme Court recognized the distinction between a provider that self-disallowed a claim pursuant to a Medicare regulation that it intended to challenge before the Board and a provider that failed to claim all reimbursement it was entitled to under the regulations. The Court stated, with respect to the provider in *Bethesda*, that:

Thus, petitioners stand on different grounds than do providers who bypass a clearly pre-

[2] Administrator Dec. No. 97-D29.

[3] Administrator Dec. No. 98-D94.

[4] Provider's Comments, dated 1/21/00 at 7. The Provider states that the costs at issue are reflected in Worksheet A, lines 71 through 81; Worksheet B, Part 1, lines 71 and 81; and Worksheet H-4.

[5] *Id.* The Board may also take jurisdiction of late-filed appeals "for good cause shown" (42 CFR 405.1841(b)).

[6] 485 U.S. 399 (1988).

[7] *Id.* at 404. The Supreme Court in *Bethesda*, 485 U.S. 399 (1988), addressed the issue of "dissatisfaction" as set forth in Section 1878 of the Act. The provider in *Bethesda* "self disallowed" certain claims on the cost report submitted to its intermediary, in order to comply with a Medicare regulation that it intended to challenge before the Board.

**¶ 80,415**                    ©2000, CCH INCORPORATED

*EXHIBIT 1*

scribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules. While such defaults might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary, those circumstances are not presented here....[8]

This language in *Bethesda* recognizes that a hospital that does not request reimbursement for all of the costs for which it is entitled to be reimbursed in its cost report, cannot then request such costs before the Board.

In this case, the record shows that the Intermediary issued the notice of program reimbursement or NPR on September 30, 1993.[9] As acknowledged by the Provider, the Intermediary made no adjustments to the cafeteria statistics and made no adjustments to the HHA administrative costs in the settlement of the cost report.[10] The Provider timely filed a Board appeal on March 23, 1994.[11] On September 2, 1994, when the Provider filed its List of Issues (LOI) with the Board, neither the HHA cafeteria statistics issue or the HHA administrative cost issue in dispute were included.[12] All of the issues in the Provider's original LOI were settled through the administrative process with the Intermediary.[13] However, through its preliminary position paper, dated November 4, 1997, the Provider raised the additional issues in dispute and requested these issues be added to its appeal pursuant to 42 C.F.R. 405.1841(a)(i) for Board consideration.

Applying the above laws to the facts of this case, the Administrator finds that no Medicare law, regulation or manual instruction precluded the Provider from properly claiming the HHA cafeteria costs or from claiming the HHA administrative costs. As such, the Administrator

finds that the Provider is unable to demonstrate that under the applicable rules, it met the dissatisfaction requirement for Board jurisdiction. Thus, the Provider is not permitted to raise these issues for the first time on appeal under § 1878(a) of the Act.[14]

The Board stated that jurisdiction exists under § 1878(d) of the Act and that the Provider was allowed to add the issues under 42 CFR 405.1841(a)(i). Section § 1878(d) of the Act, states:

> The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report ... even though such matters were not considered by the intermediary in making such final determination.[15]

The Administrator notes however, that the Board's position, fails to recognize the place that § 1878(d) occupies in Medicare's statutory structure. The Supreme Court noted that § 1878(d)[16] does not confer jurisdiction, but rather sets forth the Board's powers and duties *after* its jurisdiction has properly been invoked under § 1878(a)[17] of the Act. Thus, a Provider cannot use § 1878(d) of the Act, in conjunction with the regulation at 42 C.F.R. 405.1841, which allows the adding of issues, to bootstrap a claim, that was never first presented to the intermediary, to a pending Board appeal. The issues in dispute do not involve any dissatisfaction with an action taken by the Intermediary with respect to the Provider's cost report, but rather involves the Provider's dissatisfaction with how it claimed certain costs on its cost report. As the Seventh Circuit stated in *Little Company of Mary Hospital and Health Care Centers v. Shalala,* 165 F. 3d 1162 (1999):

---

[8] *Id.*

[9] Provider's Exhibit 1.

[10] Intermediary's Position Paper at 6-22. *See also* Intermediary's Exhibits 3 & 10.

[11] 42 C.F.R. § 405.1841(a)(1) requires that an appeal be filed within 180 days of the NPR.

[12] Provider's Exhibit 2.

[13] Provider's Position Paper at 2.

[14] Pursuant to 42 C.F.R. § 405.1885(a), a Provider may request a reopening of its cost report from the Intermediary to correct errors in the Provider's cost report. The Administrator notes that the time period for requesting a reopening in this case lapsed on September 30, 1996, before the Provider had identified the errors in its cost report and requested to have an appeal of those errors added to the Board hearing. The Provider acknowledges that if the error had been identified sooner it could filed an amended cost report, or if the error had been identified within three years of the date of the NPR, it could have requested reopening to correct the error. Contrary to the Provider's arguments, the

lack of Board jurisdiction over reopening denials and the three-year limit on requesting reopening does not lend support to an expansion of Board jurisdiction under the facts of this case. Rather, allowing Board jurisdiction would circumvent the established process and timeframes for correcting cost reports.

[15] *See,* § 1878(d) of the Social Security Act.

[16] Section 1878(d) of the Act states that: "The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report ... even though such matters were not considered by the intermediary in making such final determination."

[17] *See, Bethesda,* 485 U.S. at 406 (emphasis added) where the court stated:

> This [Section 1878(d)] language allows the Board, *once it obtains jurisdiction pursuant to subsection (a),* to review and revise a cost report with respect to matters not contested before the fiscal intermediary.

EXHIBIT ___1___

12

The board is allowed to review a ruling by a fiscal intermediary only if the provider (the hospital in this case) "is dissatisfied with a final administrative defemination of the ... fiscal intermediary ... as to the amount of total program reimbursement due the provider." 42 USC 1395oo(a)(i)..... [W]hile the statute is curiously worded the intent is plain that the provider must give the intermediary a first shot at the issue, provided the issue is within the intermediary's competence.... *Id.* at 1165.

Accordingly, the jurisdictional decision of the Board is reversed and the HHA cafeteria cost and HHA administrative cost issues are dismissed.

### DECISION

The decision of the Provider Reimbursement Review Board is reversed.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES

---

[¶ 80,416]   **The Christ Hospital v. Blue Cross and Blue Shield Association/AdminiStar Federal, Inc.**

*HCFA Administrator Decision,* Feb. 11, 2000.

### Medicare: End-Stage Renal Disease

**Provider reimbursement—Composite rate reimbursement for home dialysis—Exception requests.**—A renal facility's request for a composite rate exception based on atypical service intensity/patient mix was improperly denied by the HCFA intermediary on the grounds the facility failed to include home dialysis patients in computing any of its percentages. Section 1881(b)(7) of the Social Security Act permits the Secretary to grant exceptions to the standard composite payment rate when warranted by various unusual circumstances. The provider did include home dialysis patients in its exception request to HCFA; therefore, HCFA must reexamine the data. The PRRB's decision is therefore vacated and remanded to HCFA for further consideration.

See ¶ 7598U.

**PRRB Dec. No. 2000-D8 (Guide ¶ 80,383) is vacated and remanded.**

### [Text of Decision]

## HEALTH CARE FINANCING ADMINISTRATION

### *Decision of the Administrator*

In the case of: **THE CHRIST HOSPITAL Provider vs. BLUE CROSS AND BLUE SHIELD ASSOCIATION/ADMINASTAR FEDERAL, INC.** Intermediary

### Review of: PRRB Decision No. 2000-D8

### Dated: December 12, 1999

This case is before the Administrator, Health Care Financing Administration (HCFA), for review of the decision of the Provider Reimbursement Review Board (the Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (the Act), as amended (42 USC 1395oo(f)). The parties were notified of the Administrator's intention to review the Board's decision. HCFA's Center for Health Plans and Providers (CHPP) submitted comments requesting that the Administrator reverse the Board's decision. The Provider also submitted comments requesting that the Administrator affirm the

Board's decision. Accordingly, the case is now before the Administrator.

### BACKGROUND

On April 27, 1994, the Provider submitted to the Intermediary its End-Stage Renal Disease (ESRD) Composite Rate exception request based on atypical service intensity/patient mix and self-dialysis training.[1] By letter dated July 5, 1994, HCFA denied Provider's request for a composite rate exception based on atypical service intensity/patient mix on grounds that the documentation submitted by the Provider to support the atypicality of its patient population, did not include home dialysis patients in computing any of the patient averages. The Provider appealed.

### *ISSUE AND BOARD'S DECISION*

The issue in this case is whether HCFA properly denied the Provider's request for an exception to the End Stage Renal Disease (ESRD) composite rate based on atypical service intensity, pursuant to 42 C.F.R. § 413.170, *et seq* (1993).

The Board held that HCFA's denial of the Provider's request for an exception to the ESRD

---

[1] Provider's Position Paper at 4. *See also* Provider's Exhibits 1-A through 28. At the time the exception request was submitted, the Provider's current composite rate was

$131.33. The exception request sought a composite rate of $157.89.

**¶ 80,416**

©2000, CCH INCORPORATED

EXHIBIT _1_

Circuit Court of Appeals, the Administrator should apply that court's interpretation of the OBRA Moratorium.[3]

### DISCUSSION AND EVALUATION

The record furnished by the Board has been examined, including all correspondence, position papers and exhibits submitted by the parties. The Board's decision has been reviewed by the Administrator. All comments received after entry of the Board's decision have been made a part of the record and have been considered.

In this case, the Administrator notes the Provider's argument that the Intermediary changed its methodology for calculating the 120-day Manual requirement, thus violating the OBRA Moratorium. Notably, the Administrator has consistently held that in accordance with the language of the moratorium and its legislative history, an intermediary has no authority to waive the provisions of the regulations and program instructions. Therefore, regardless of whether an intermediary had "accepted" the past bad debt practices of a provider, the provider's failure to comply with the regulations and the Manual, negates application of the OBRA Moratorium provision.

Notwithstanding the above, the Administrator recognizes that the Provider is located in the Fifth Circuit, where the United States Court of Appeals, in *Harris County, supra,* held that the OBRA Moratorium's prohibition against forcing a change in hospital policy is triggered by the intermediary's acceptance of the hospital's existing policies before August 1, 1987.[4] Although the Administrator does not agree with the Court's broad interpretation of the OBRA Moratorium, the Administrator recognizes that the *Harris* decision constitutes binding precedent in the Fifth Circuit. Therefore, applying the *Harris* holding to the instant case, the Administrator finds that the Intermediary's disallowance of the Provider's cost year 1989 bad debts must be reversed, and the Board's holding on this issue is affirmed on the specific grounds set forth herein. This finding is applicable only to the limited facts and circumstances presented in this case.

### DECISION

The Provider Reimbursement Review Board's decision in this case is affirmed as set forth in the foregoing opinion.

## THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.

---

**[¶ 45,181]   Westchester General Hospital v. Blue Cross and Blue Shield Association/Blue Cross of Florida.**

*HCFA Administrator Decision,* Jan. 27, 1997.

#### Medicare: Liquidation of Liabilities

**Provider reimbursement—Cost data and cost finding—Liquidation of liabilities—Indigent care tax assessment.**—The Board did not have jurisdiction over a provider's complaint that its intermediary acted improperly in refusing to amend the provider's 1984 cost report to include a state indigent care tax assessment. The provider filed its cost report for 1984 in September 1985 but failed to include the 1984 tax assessment, notice of which was issued in June 1985, in the original cost report. The provider requested an amendment, but the intermediary did not include the tax assessment in the provider's 1984 Notice of Program Reimbursement (NPR). The Board ruled that the intermediary should have amended the cost report to reflect the tax assessment, but the intermediary's refusal to amend was proper under the reopening regulations, which limit jurisdiction for reopening to the administrative body rendering the last determination or decision. The Board also lacked jurisdiction over the tax cost issue because the provider's error in failing to include the tax costs on the 1984 NPR precluded it from claiming dissatisfaction with the intermediary's final determination.

See ¶ 6424.60.

**PRRB Dec. No. 97-D15 (GUIDE ¶ 44,942) is vacated.**

#### [Text of Decision]

This case is before the Administrator, Health Care Financing Administration (HCFA), for review of the decision entered by the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (Act), as amended [42 USC 1395oo(f)]. Comments were received from the Intermediary, requesting review. The parties were then notified of the Administrator's intention to review the Board's decision. Subsequently, the Provider submitted comments. Ac-

---

[3] See *Harris County Hospital District v. Shalala,* 64 F.3d 220 (5th Cir. 1995).

[4] *Id.* 64 F.3d at 222.

**¶ 45,181**

EXHIBIT __1__

14

cordingly, the case is now before the Administrator for final administrative decision.

## BACKGROUND

The Provider filed its fiscal year ending (FYE) 12/31/84 cost report (1984 cost report) on September 11, 1985. However, the Provider did not include a claim for the State of Florida's Indigent Care Tax Assessment on its cost report. The notice of this tax assessment was issued by the State on June 18, 1985. Pursuant to a letter dated May 14, 1986, the Provider requested that it be allowed to amend the 1984 cost report to include the expense of the tax assessment. The record does not reflect whether the Intermediary denied the Provider's request to amend in a written response; however, the Intermediary did not include the tax assessment in the Provider's Notice of Program Reimbursement (NPR) for the 1984 cost report, issued on December 11, 1987. Subsequently, the Provider timely appealed a number of adjustments pursuant to the NPR.

## ISSUE AND BOARD'S DECISION

The issue before the Board was whether the Intermediary's refusal to amend the Provider's cost report to include the Provider's indigent care tax assessment was an abuse of discretion.

The Board found that the cost at issue was "substantial," and that the Intermediary knew the Administrator's position on the allowability of the tax assessment from the decisions in the *Florida Group Appeal*[1] cases. Moreover, the Intermediary reopened the cost report at issue to effectuate the settlement of other issues under appeal for that cost year. Accordingly, the Intermediary should have revised the Provider's cost report to include the tax. Furthermore, the Board noted that it has been HCFA's historical position that costs must be accurately recorded, even if cost reports must be amended or reopened. The Board also stated that it did not need to find whether the tax was "material," because it found that it was substantial and should be accurately recorded. Moreover, the Board found that **the discretionary amendment provision of § 2931.2A of the Provider Reimbursement Manual (PRM)** was inapplicable since the Inter**mediary** "had a clear opportunity" to add **the cost** during the reopening for settlement purposes. In conclusion, the Board found that the Intermediary abused its discretion, and ordered the Intermediary to reopen the cost report and record the cost of the indigent care tax consistent with the Board's and Administrator's decisions in the *Florida Group Appeal* cases.

## SUMMARY OF COMMENTS

The Intermediary commented, requesting that the Board's decision be reversed. First, the Intermediary argued that the Board had no jurisdiction to review for abuse of discretion. Because the Provider is located in the Eleventh Circuit, the jurisdiction to review a denial of a reopening request recognized by the U.S. Court of Appeals for the Ninth Circuit in *Oregon v. Bowen*,[2] would not apply. Second, even if the Provider had claimed the tax assessment in its 1984 cost report, the Intermediary would have disallowed it. Until the *Florida Group Appeal* cases were decided in 1990, the Intermediary's position was that the tax was not a Medicare allowable cost until it was assessed, i.e., 1985, not when it accrued. Thus, the Intermediary did not abuse its discretion by rejecting the Provider's request to amend its cost report, and recognizing the tax assessment in the Provider's subsequent cost year. Finally, the Intermediary argued that allowing the Board's review of refusals to amend would "invite an unacceptable alternative to using" the regulatory appeal procedures.

The Provider commented, stating that in the *Florida Group Appeal* cases, the Board and the Administrator have held that providers are entitled to claim the cost of the indigent tax assessment in the year in which it was accrued. The Provider stressed that at the time the Intermediary refused the Provider's amendment request, the Intermediary was following an erroneous interpretation of law. Moreover, the statute and regulations grant providers the right to Board review of intermediary determinations, which right the Provider exercised here; i.e., the nonallowance of the tax costs in the cost report was an intermediary determination. In addition, the Intermediary incorrectly claims that this case involves a reopening, which the Administrator has determined is nonreviewable. Rather, the Provider is appealing the Intermediary's refusal to permit the Provider to amend its cost report prior to the issuance of an NPR. Furthermore, the rationale behind restricting review of reopening determinations is presumably that the provider could have appealed the issue from an NPR, and thus should not be permitted two appeal opportunities. In this case, however, the Provider appealed the Intermediary's action from the NPR. For all of these reasons, the Provider argued that the Board's decision should be affirmed.

---

[1] *Florida Group Appeal—Indigent Care Tax Assessments,* PRRB Dec. Nos. 90-D61 and 90-D62, Sept. 20, 1990, *aff'd,* HCFA Admin. Dec., Nov. 20, 1990.

[2] 854 F.2d 346 (9th Cir., 1988).

**¶ 45,181**

©1997, Commerce Clearing House, Inc.

EXHIBIT ___1___

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments received timely are included in the record and have been considered.

First, the Administrator further finds that the Intermediary's refusal to amend the cost report falls under the scope of the reopening regulations at 42 CFR 405.1885. *See also* § 2931.2 of the PRM. Under the regulation, § 405.1885(c) limits jurisdiction for "reopening a determination or decision ... exclusively [to] ... that administrative body that rendered the last determination or decision."[3] Therefore, applying the law to the facts in this case precludes Board jurisdiction over the Intermediary's refusal to amend.

Moreover, the Board does not have jurisdiction over the tax cost issue, pursuant to the Provider's NPR. The Administrator notes that under § 1878(a) of the Act, the Board's jurisdiction is limited to requests for review of "final determination[s]" of the Intermediary or the Secretary for which the provider is "dissatisfied."[4]

Generally, for a provider to demonstrate dissatisfaction with the reimbursement reflected on the NPR, the provider must have requested reimbursement for all costs to which it is entitled under the applicable rules. Thus, a provider who fails to claim a cost on a cost report, not because of binding law or policy, but because of error, does not meet the dissatisfaction requirement necessary for Board jurisdiction.[5]

Applying the above law to the facts of this case, the record reflects that the State tax assessment costs were not claimed by the Provider on its cost report. Consequently, under the well-developed body of law applicable to this case, the Board did not properly have jurisdiction over the State tax issue pursuant to the Provider's NPR for the 1984 cost year.

Accordingly, because the Administrator finds that the Board did not have jurisdiction to hear the remaining issue presented before the Board, the decision of the Board is vacated.

## DECISION

The decision of the Provider Reimbursement Review Board is vacated in accordance with the foregoing opinion.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES**

---

**[¶ 45,182]  Hennepin County Medical Center v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Minnesota.**

*HCFA Administrator Decision,* Jan. 13, 1997.

#### Medicare: Bad Debts

**Provider reimbursement—Allowable costs—Bad debts—Collection policy.**—The intermediary properly disallowed bad debt costs claimed on a provider's 1984 and 1985 cost reports because the provider did not make a reasonable collection effort. The regulations and *Manual* guidelines require that, when using a collection agency, all uncollected charges of a like amount must be referred to the agency for the collection effort to be deemed reasonable. Here, the provider admitted that it referred its non-Medicare accounts, but not its Medicare accounts, to a collection agency. The provider contended that the intermediary had accepted its collection practices as of August 1, 1987, and that the intermediary therefore was barred under the moratorium enacted by the Omnibus Budget Reconciliation Act of 1987 (PubLNo 100-203), as amended, from imposing a more stringent standard. For purposes of the moratorium, however, an intermediary's acceptance of a provider's collection practices must have been in accordance with regulations and policy guidelines in effect as of August 1, 1987. Because the provider's policy of referring only non-Medicare accounts to a collection agency did not conform with the *Manual* instructions in effect on that date, the moratorium was inapplicable.

See ¶ 5233.50, ¶ 5233.60.

**PRRB Dec. No. 97-D8 (GUIDE ¶ 44,934) is modified.**

---

[3] *See also Good Samaritan Hospital regional Medical Center v. Shalala,* No. 95-6224 (2nd Cir. 1996).

[4] "Final determination" is defined in regulation 42 CFR 405.1801, which states that for purposes of appeal to the Board, "intermediary determination" is synonymous with "intermediary's final determination" and "final determination of the Secretary," as those latter two terms are used in § 1878(a) of the Act.

[5] *See Bethesda Hospital Association v. Bowen,* 485 U.S. 399 (1988).

**¶ 45,182**

# EXHIBIT __J__

16

Based on the foregoing analysis, the Administrator finds that the Provider did not meet the IEF criteria. Therefore, the Provider is not entitled to an exception to the ESRD composite rate as an isolated and essential facility.[20]

### Decision

The Provider does not qualify for an exception to the ESRD composite payment rate as an isolated and essential facility. The decision of the Provider Reimbursement Review Board is reversed.

This Constitutes the Final Administrative Decision of the Secretary of Health and Human Services.

---

[¶ 41,690]   Bon Secours Heartlands Home Health Agency v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Maryland.

*HCFA Administrator Decision*, Aug. 23, 1993.

#### Medicare: PRRB Jurisdiction; Self-Disallowed Costs

**Provider reimbursement—Provider payment determinations and appeals procedures—PRRB jurisdiction—Self-disallowed costs.**—The Board does not have jurisdiction to review, pursuant to a provider's notice of program reimbursement, the provider's claim for self-disallowed costs, *i.e.*, costs that (1) were not claimed on the provider's cost report and (2) are not prohibited by a regulation or other Medicare program policy. Sec. 1878(a) of the Social Security Act limits the Board's jurisdiction to provider requests for review of final determinations of the intermediary for which the provider is dissatisfied. Reg. Sec. 405.1801(a)(1) defines an intermediary determination as a determination of the amount of total reimbursement due the provider following the close of the provider's cost reporting period. Accordingly, the Board's decision to grant a home health agency's request for a hearing on the issue of interest expense that was not claimed on the HHA's cost report was improper because there was no final determination regarding the interest expense for which the HHA was dissatisfied.

The Board also lacked jurisdiction over the intermediary's denial of the HHA's request to amend the cost report to include the interest expense because (1) a denial of a request to amend does not qualify as a final determination and (2) the HHA's request was not timely made. In addition, jurisdiction did not exist over the intermediary's refusal to reopen the cost report to consider the interest expense costs because Reg. Sec. 405.1885(c) grants the power to reopen a determination exclusively to the administrative body that rendered the determination. Further, the intermediary's original decision to reopen the cost report did not amount to a reopening, which would have been appealable pursuant to Reg. Sec. 405.1889, because, before beginning the reopening process, the intermediary sent two letters denying the request to reopen. Finally, the intermediary's letters denying the HHA's requests to reopen and amend the cost report, which allegedly incorrectly informed the HHA that it had the right to appeal, did not confer jurisdiction on the Board because (1) the intermediary had no authority to confer jurisdiction on the Board, as jurisdiction did not exist by statute or regulation, and (2) there was no legal or factual basis for applying equitable estoppel in this case.

See ¶ 7715.75.

**PRRB Dec. No. 93-D49 (Guide ¶ 41,574) is vacated.**

---

(Footnote Continued)

utilization with **inefficiency**, stating that "[a]lthough lower frequency of **treatments may result** in fewer treatments to spread costs across; **higher overhead costs** may be the result of inefficiency; i.e. **low utilization.**

[20] The Administrator notes that, even if the Board was correct in finding that the Provider otherwise met the IEF criteria, this case should have been remanded to HCFA to determine whether the Provider satisfied the documentation requirements of section 2725.4 of the PRM. The evidence at the hearing shows that the Provider did not fully document its exception request. At the time that it reviewed the request, HCFA did not request additional documentation because it found that, based on the documentation submitted, the Provider did not meet the necessary criteria. The Board made no finding on this issue. Under these circum-

stances, the proper course of action in this case would have been to give the Provider another opportunity to submit a fully documented request and to give HCFA the opportunity to then rule on the sufficiency of the documentation. If a request is denied for reasons that are apparent on the face of the request, HCFA is not required to request additional information.

Under these circumstances, it would also have been error for the Board not to have remanded the case to HCFA for a determination on the reasonableness of the requested rate. The Board, in effect, granted the Provider the requested composite rate of $152.64, yet HCFA made no finding as to the reasonableness of the rate requested. In this case no argument as to the reasonableness of the rate was presented by the parties and the Board made no such finding.

**¶ 41,690**

©1993, Commerce Clearing House, Inc.

17

EXHIBIT ___1___

### [Text of Decision]

This case is before the Administrator, Health Care Financing Administration (HCFA), for review of the decision entered by the Provider Reimbursement Review Board (Board). The review is during the 60-day period in section 1878(f)(1) of the Social Security Act (the Act), as amended (42 U.S.C. 1395oo). Following the Board's decision, the Intermediary and the Provider timely submitted comments, both requesting that the Board's decision be reversed.

The parties were then notified of the Administrator's intent to review this decision and of their right to submit comments during the course of this review. No further comments were submitted. Accordingly, the case is now before the Administrator for final administrative decision.

### Background and Issue

This case involves the issue of whether the Board had jurisdiction to hear the Provider's appeal. In this case the Provider did not claim reimbursement for interest expense incurred on a loan from a related party. Subsequently, the Provider requested that it be allowed to amend its cost report, seeking to avail itself of the exception for religious orders to the general rule that interest expense on a loan from a related party is not reimbursable.[1] The Intermediary denied the Provider's request and issued the Notice of Program Reimbursement (NPR). After the NPR was issued, the Provider requested that the cost report be reopened. In a letter to the Provider, the Intermediary initially indicated that it would reopen the cost report, but then, in another letter, informed the Provider that it would not in fact reopen the cost report.

The Provider requested a hearing before the Board solely on the issue of the self-disallowed interest expense and the Intermediary objected on jurisdictional grounds. On February 22, 1991, the Board, with one member dissenting, determined that it had jurisdiction. The Intermediary requested reconsideration of this determination, and the Board upheld its initial determination of jurisdiction, again with one member dissenting. On June 23, 1993, the Board issued its decision on the merits.

### Summary of the Board's Decision on Jurisdiction

The **Board** held that it had jurisdiction because the evidence indicates that the Intermediary led the Provider to believe that an appeal would be permitted. The Intermediary's April 11, 1989 letter to the Provider, denying the request to amend the cost report, "is equivalent to a notation on an audit adjustment report." The Board found that after vacillating over whether it would reopen the cost report, the Intermediary finally denied the requested re-opening and reminded the Provider that it had appeal rights which flowed from the issuance of the NPR.

One Board member dissented, stating that the Intermediary's refusal to allow the Provider to amend the cost report was not a final determination under the statute and the regulations. Even if the Intermediary's denial of the request to amend the cost report were a final determination, the appeal from the denial was filed late. Also, the Intermediary incorrectly informed the Provider that the Provider would have appeal rights, but the Intermediary's advice did not confer jurisdiction on the Board, as the Board is bound by the Secretary's regulations. Finally, the Supreme Court's decision in *Bethesda Hospital* [1988-2 Transfer Binder ¶ 37,044], allowing an appeal of self-disallowed costs, does not apply to the facts of this case where the self-disallowance was the result of the Provider's negligence.

### Summary of Comments

The Intermediary commented that the Board did not have jurisdiction to consider the Provider's appeal. The Board lacked jurisdiction because the interest expense was not claimed on the cost report, but rather was self-disallowed. The Intermediary did not mislead the Provider into believing that the Provider had appeal rights with respect to the self-disallowance and even if it had attempted to give the Provider appeal rights, it was powerless to do so. The district court case that the Board relied on to assume jurisdiction was effectively overruled by a subsequent court of appeals case from the same circuit. Moreover, a denial of a request to amend a cost report is not an appealable determination and even if it were, the Provider failed to appeal within 180 days of the amendment denial. The Intermediary's indication that it would reopen the cost report was not a reopening, and the Board had no jurisdiction to review a refusal to reopen.

The Provider commented that the Board's bases for granting jurisdiction were correct. It said that in particular it believed that the Intermediary's refusal to allow the Provider to amend the cost report was appealable.

### Discussion

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments received timely are included in the record and have been considered.

After a review of the record, the Administrator finds that the Board did not have jurisdic-

---

[1] *See* 42 CFR 413.153(c)(2).

**Medicare and Medicaid Guide**                                                **¶ 41,690**

EXHIBIT ___1___

tion to hear the Provider's appeal.[2] In this case, the interest expense was not appealable pursuant to the NPR as there was not a final determination with respect to the expense with which the Provider was dissatisfied. Moreover, neither the denial of the request to amend the cost report, nor the denial of the request to reopen the cost report, was an appealable final determination. Finally, the Intermediary's actions did not confer jurisdiction on the Board.

Under section 1878(a) of the Act [¶ 17,102], the Board's jurisdiction is limited to requests for review of "final determination[s]" of the Intermediary or the Secretary for which the provider is "dissatisfied." "Final determination" is not defined in the Act, but is defined in regulation 42 CFR 405.1801. Section 405.1801(a)(3) [¶ 20,701] states that for purposes of appeal to the Board, "intermediary determination" is synonymous with "intermediary's final determination" and "final determination of the Secretary" as those latter two terms are used in section 1878(a) of the Act. Section 405.1801(a)(1) defines "intermediary determination," with respect to the cost reimbursement system, as:

> a determination of the amount of total reimbursement due the provider, pursuant to § 405.1803 following the close of the provider's cost reporting period, for items and services furnished to beneficiaries for which reimbursement may be made on a reasonable cost basis under Medicare for the period covered by the cost report.

Prior to the Supreme Court's decision in *Bethesda Hospital Association v. Bowen*,[3] discussed below, several courts decided cases involving the appealability of cost items that were self-disallowed, i.e., items that were included on the cost reports but not claimed as reimbursable. The Secretary's position throughout this litigation was that the jurisdictional requirement that a provider be "dissatisfied with a final determination of its fiscal intermediary" necessarily incorporates an exhaustion requirement. In other words, a provider's right to a hearing extends only to claims for reimburse-

ment because a provider cannot be "dissatisfied" with the intermediary's determination to not award reimbursement for something that was never claimed on the cost report. This position was accepted by some courts[4] and rejected by others.[5]

In 1988, the Supreme Court decided *Bethesda Hospital*. In *Bethesda*, the providers, following the 1979 regulations, in effect self-disallowed malpractice insurance costs in excess of those allowed by the 1979 regulation. The providers later filed a timely request for a Board hearing but the Board determined it was without jurisdiction to hear the providers' claims. The case eventually reached the Supreme Court. The Secretary again argued that a provider's right to a hearing extends only to claims presented to its intermediary because the provider cannot be "dissatisfied" with the intermediary's decision to award the amounts requested in the provider's cost report. The providers argued that in view of the 1979 regulation on malpractice insurance costs, it would have been improper to submit a claim for reimbursement in a manner prohibited by the regulations and that it was proper for them to raise the issue in the first instance to the Board. The Court held that the Board had jurisdiction over the claims, stating:

> *We agree that, under subsection (a)(1)(A)(i) [of section 1878 of the Act], a provider's dissatisfaction with the amount of its total reimbursement is a condition to the Board's jurisdiction. It is clear, however, that the submission of a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations does not, by itself, bar the provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations. No statute or regulation expressly mandates that a challenge to the validity of a regulation be submitted first to the fiscal intermediary. Providers know that, under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, that the intermediary is without power to award reimbursement except as the regulations provide, and*

---

[2] In this case the Board found that it had jurisdiction and proceeded to rule on the Provider's claim for reimbursement for interest expense incurred on a loan from a related organization. Although the Provider requested review on the merits, because the Administrator reverses the Board's determination that it had jurisdiction to hear the appeal, the Administrator does not reach the merits of the Provider's appeal. The Administrator notes, however, that the Board's determination, that the Provider was not entitled to reimbursement for the interest expense because it failed to supply the necessary documentation for the existence and terms of the loan, is correct.

[3] 485 U.S. 399 (1988).

[4] *See, e.g., University of Cincinnati v. Secretary of Health and Human Services*, 809 F.2d 307 (6th Cir. 1987); *North*

*Broward Hosp. Dist. v. Bowen*, 808 F.2d 1405 (11th Cir. 1987); *Community Hospital of Roanoke Valley v. Health and Human Services*, 770 F.2d 1257 (4th Cir. 1985); *Athens Community Hospital, Inc. v. Schweiker*, 686 F.2d 989 (D.C. Cir. 1982), *modified in Athens Community Hospital, Inc. v. Schweiker*, 743 F.2d 1 (D.C. Cir. 1984).

[5] *See, e.g., Adams House Health Care v. Heckler*, 817 F.2d 587 (9th Cir. 1987); *St. Luke's Hospital v. Secretary of Health and Human Services*, 810 F.2d 325 (1st Cir. 1987) (finding there is jurisdiction but that the Board has discretion to exercise jurisdiction); *St. Mary of Nazareth Hospital Center v. Department of Health and Human Services*, 698 F.2d 1337 (7th Cir. 1983), *cert. denied sub nom. St. James Hospital v. Heckler*, 464 U.S. 830 (1983).

**¶ 41,690**                                              ©1993, Commerce Clearing House, Inc.

EXHIBIT

that any attempt to persuade the intermediary to do otherwise would be futile. *Thus, petitioners stand on different ground than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules.*[6]

The underscored language above demonstrates that *Bethesda* is distinguishable from the instant case. The distinction between a provider who seeks to bypass the intermediary in order to challenge a regulation, and a provider who self-disallows an item on a cost report and later files for a Board hearing alleging that it is entitled to reimbursement "under applicable rules," was recently noted in *Little Company of Mary Hospital and Health Care Centers* [1993-1 Transfer Binder ¶ 40,967].[7] The court read *Bethseda* to mean that "only where a petitioner can demonstrate that a challenge made to a fiscal intermediary in the first instance would have been futile will that petitioner be permitted the issue for the first time on appeal under [section 1878(a)]." Prior to *Bethesda*, the court in *Tallahassee Memorial Regional Medical Center v. Bowen*[8] [1987-2 Transfer Binder ¶ 36,298] held that the Board had jurisdiction where the providers in the case self-disallowed costs due to the clear mandate of a regulation and then challenged the regulation, but it indicated that jurisdiction would not exist if a provider self-disallows costs without relying on a regulation that it wishes to challenge.[9]

In *Somerset Rehabilitation, P.C. v. Blue Cross and Blue Shield Association*[10] [1990 Transfer Binder ¶ 38,661], a case involving self-disallowed costs, the Administrator upheld the Board's dismissal for lack of jurisdiction. The Administrator agreed with the Board that the case was distinguishable from *Bethesda*. The Administrator stated:

In this case, the Provider did not claim on its cost report reimbursement for Medicare bad debts and certain owners compensation. The Provider did not refrain from claiming these costs because of a regulation or other program

policy. Therefore, the Provider is now precluded from claiming those costs at the [Board].

The Administrator follows the decision in *Somerset Rehabilitation* and holds that the self-disallowed interest expense was not appealable as it was not a final determination for which the Provider was "dissatisfied."

The Administrator also holds that the denial of the request to amend the cost report was not an appealable final determination. The Provider has argued that:

the intermediary's letter to the provider of April 11, 1989[,] which was sent prior to the issuance of the Notice of Program Reimbursement (NPR) clearly denied the provider's request to amend the cost report. This letter was a negative determination upon which jurisdiction for an appeal could be based under 42 CFR § 405.1803(a) and (a)(1).

The Administrator disagrees. The regulatory definition of "final determination," as set forth above, does not encompass a denial of a request to amend a cost report. Even if the Provider were correct that the denial of the request to amend was appealable, however, the Board did not have jurisdiction because the appeal to the Board—filed on November 14, 1989—was more than 180 days after the Intermediary's April 11, 1989 letter. Section 1878(a)(3) of the Act and section 405.1841(a) of the regulations require that a final determination be appealed within 180 days of the date that notice of it was mailed to the provider.[11]

Likewise, the Intermediary's refusal to reopen the cost report was not a final determination. After the NPR was issued, the Provider, on July 7, 1989, again requested that the interest expense on the loan be allowed. Although not styled as such, this request was a request for reopening, because it postdated the issuance of the NPR. Section 405.1885(c) [¶ 20,785] of the regulations states:

Jurisdiction for reopening a determination or decision rests exclusively with that admin-

---

[6] 485 U.S. at 404-05, emphasis added.

[7] No. 92 C 7900 (N.D. Ill. 1993).

[8] 815 F.2d 1435 (11th Cir. 1987).

[9] *Id.* at 1457, 1463. The Administrator's view of *Tallahassee* is supported by the Supreme Court's understanding of *Tallahassee. See Bethesda*, 485 U.S. at 403, n. 1. In *Community Hospital of Roanoke Valley v. Health and Human Services*, 770 F.2d 1257 (4th Cir. 1985), the court denied jurisdiction under the facts of its case but indicated that the result would have been different if the providers would have notified their intermediary of their intent to challenge the policy that caused them to disallow costs. *Id.* at 1263.

[10] HCFA Administrator Decision, PRRB No. 87-530 (1990).

[11] Moreover, even if the Provider were correct that the Board had jurisdiction over the Intermediary's refusal to amend its cost report, the issue before the Board would have been confined to just that; the Board would not have had jurisdiction to determine whether the interest expense was allowable. Rather, the Board's duty would have been to determine whether the Intermediary was correct to deny the amendment request and if it determined that the Intermediary erred by refusing the requested amendment, it would have been required to remand the case to the Intermediary in order for the Intermediary to make a formal determination on the merits of the Provider's claim.

EXHIBIT __

20

istrative body that rendered the last determination or decision.

Therefore, an intermediary's refusal to reopen a determination is not reviewable by the Board. Moreover, sections 405.1887 and 405.1889 of the regulations provide that when the administrative component wishes to reopen a cost report, it will send a notice to the parties, giving the parties the opportunity to comment. If the reopening leads to a "revision," a notice of the revision will be sent to the parties. Pursuant to section 405.1889, a "revision shall be considered a separate and distinct determination or decision to which the provisions of ... 405.1835 [(right to a Board hearing)] are applicable." Thus the regulations contemplate a specific and formal process for a reopening/revision, and direct that only where the reopening leads to a "revision" is a party entitled to a Board hearing on the matter in dispute.

In this case, contrary to the assertion of the Provider, there was no reopening and revision. In a letter to the Provider dated July 14, 1989, the Intermediary indicated that it would reopen the cost report. However, it is apparent from this letter that the Intermediary had not at this time begun the formal reopening process. On July 26, 1989, without having sent notices and without having made any revision to the adjustment, the Intermediary wrote to the Provider stating that it would not reopen the cost report. This letter was followed by another letter from the Intermediary to the Provider, dated August 15, 1989, in which the Intermediary again indicated that it was not reopening the cost report. Thus it is clear that there was no reopening/revision in this case and the Provider was not entitled to a hearing under the reopening regulations.

Finally, the Administrator notes that the Intermediary's conduct did not create jurisdiction. In its February 22, 1991 determination, the Board found that it had jurisdiction to hear the Provider's appeal "because the evidence submitted indicates that the Intermediary led the Provider to believe that an appeal would be permitted upon issuance of the NPR." In making this statement, the Board appeared to refer to both the April 11 and August 15, 1989 letters from the Intermediary to the Provider.

It is axiomatic that a party cannot confer jurisdiction on a tribunal where it otherwise does not exist. The Intermediary has no authority to expand the Board's jurisdiction beyond the statutory and regulatory parameters either through agreement or through conduct. Although the Provider has argued that jurisdiction existed on the basis of equitable estoppel and the above-quoted passage from the Board's jurisdictional determination can be read as finding jurisdiction on this basis, there is no legal or factual basis for applying equitable estoppel in this case.

The leading case on equitable estoppel as it relates to claims against the United States is *Office of Personnel Management v. Richmond.*[12] In *Richmond* the Court noted that, with one possible exception, it had never allowed a claim of estoppel against the Federal Government.[13] The Court noted that in previous decisions it had not given clear guidance to the lower courts and so issued a *per se* rule regarding cases for money claims against the Government. The Court stated:

Whether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury is a matter we need not address. As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds. In this context, there can be no estoppel for courts cannot estop the Constitution.[14]

Because the Provider's claim is one of "seeking public funds,"[15] the Administrator finds that estoppel cannot lie against the Government in this case as a matter of law.

Moreover, even if estoppel were not precluded as a matter of law, the traditional factual elements associated with a claim of estoppel,[16] are not present. Although the Board found that the intermediary misled the Provider into believing that it could appeal the self-disallowance, this clearly was not the case. The April 11, 1989 letter from the Intermediary, to which the Board apparently referred in finding that the Provider was misled into believing that it had appeal rights, is divided into four distinct parts. The first part is an introductory paragraph, stating that the intermediary was denying the request to amend the cost report. The next two

[12] __ U.S. __, 110 S.Ct. 2465 (1990).

[13] *Id. __ at __, 110 S.Ct. at 2472-73.*

[14] *Id. __ at __, 110 S.Ct. at 2476.*

[15] *See Crawford v. Community Health Services of Crawford County, Inc.* 467 U.S. 51, 63-64 (1984), in which the Court described the provider's claim for Medicare reimbursement as one for public funds.

[16] *See Crawford v. Community Health services of Crawford County, Inc., supra,* 467 U.S. at 59, where the Court

stated that in order to establish estoppel a party must have relied on its adversary's conduct in such a manner as to change its position for the worst, and that such reliance must have been reasonable in that the party claiming the estoppel did not know or should not have known that its adversary's conduct was misleading. *See also Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 589 (3d Cir. 1991).

**¶ 41,690**                    ©1993, Commerce Clearing House, Inc.

parts are indented and are entitled "1) *Interest Paid to Bon Secours,*" and "2) *Modification of Visits.*" The last part is a one line, "feel free to contact me" sentence, beginning at the left outermost margin. The only reference to appeal rights is the sentence "after the report is final [sic] settled, you will have the right to appeal the Notice of Program Reimbursement." This sentence appears in the "2) *Modification of Visits*" section. Thus it is clear from the context and the construction of the letter that the sentence pertains only to the modification of visits issue. If the Provider interpreted the letter to mean that it would have appeal rights pertaining to the interest expense, it did so unreasonably.

Likewise, although the Board stated that upon denying the request for reopening, the Intermediary "reminded the Provider that it still had appeal rights which flowed from the issuance of the NPR," this was not the case. In the August 15, 1989 letter to which the Board apparently referred, the Intermediary merely stated that "if you wish to appeal, you must meet the guidelines stated in the issued NPR's [sic]." [17]

Finally, the necessary component of detrimental reliance is absent. The Provider has not shown or even alleged that it failed to take any action to perfect an appeal as a result of the letters from the intermediary. Thus, the factual elements necessary for a claim of estoppel are not present.

*Decision*

The Board did not have jurisdiction to hear the Provider's appeal; therefore the decision of the Provider Reimbursement Review Board is vacated.

This Constitutes the Final Administrative Decision of The Secretary of Health and Human Services.

---

**[¶ 41,691] Stanly Memorial Hospital (Albermarle, N.C.)—Request for Geographic Redesignation.**

*HCFA Administrator Decision*, June 4, 1992 (review of *MGCRB Case* No. 91C0311).

**Medicare: Geographic Reclassification for PPS Payment Purposes**

**Prospective payment systems—Geographic redesignation for payment purposes—Criteria for use of adjacent area's wage index—Occupational-mix criterion.**—To be geographically reclassified to an adjacent area under Reg. Sec. 412.230(e)(1)(iii)(B) for the purpose of using that area's wage index value, a hospital must demonstrate that its average hourly wage weighted for occupational category is equal to at least 90% of the AHW in the area requested. Accordingly, the MGCRB's denial of reclassification for the purpose of using the wage index value of the urban Charlotte-Gastonia-Rock Hall, North Carolina MSA for fiscal year 1993 as requested by a rural North Carolina hospital was reversed because the hospital's AHW weighted for occupational category exceeded 90% of the requested area's AHW. The MGCRB had incorrectly computed the hospital's occupational-mix calculation.

See ¶ 4331.

**MGCRB Case No. 91C0311 is reversed.**

**[Text of Decision]**

[*Posture of Case*]

[Text omitted; virtually identical to text under "*Posture of Case*" in the Administrator's decision in ***Somerset Hospital***, reported at ¶ 41,502.]

***Issue and MGCRB Decision***

The issue involves whether the MGCRB properly denied the Hospital's application for reclassification for purposes of its wage index. The Hospital, a rural hospital located in Stanly County, in rural North Carolina, requested reclassification to the urban Charlotte-Gastonia-Rock Hall North Carolina - South Carolina Metropolitan Statistical Area (MSA) for purposes of using that area's wage index. The MGCRB denied the Hospital's request because the Hospital's average hourly wage (AHW) weighted for occupational category is less than 90 percent of the AHW for the area requested.

***Hospital's Comments***

The Hospital believed that in denying reclassification, the MGCRB had used erroneous information. The Board's calculation appeared to be incomplete because the figures in column G had not been extended for each line or data category. The Hospital enclosed a copy of the revised calculation, including all totals, which

---

[17] Similarly, in a letter dated August 30, 1989, in which the intermediary reiterated that it would not allow the Provider to amend its cost report, the intermediary instructed the Provider to "refer to the NPR for your appeal rights."

22. EXHIBIT 1





**23,816**                    New Developments                    630  9-90

[¶ 38,661]   Somerset Rehabilitation, P.C. v. Blue Cross and Blue Shield Association.

*HCFA Administrator Decision,* Aug. 16, 1990.

### Medicare: PRRB Jurisdiction: Self-Disallowed Costs

**Provider reimbursement—Provider payment determinations and appeals procedures—PRRB jurisdiction--Self-disallowed costs.**—A provider must affirmatively place an issue in controversy at the time its cost report is filed in order to preserve the ability to appeal the matter to the Board. Accordingly, in a case in which a provider failed to claim reimbursement for owner's compensation and for Medicare bad debts in its cost report, the PRRB properly dismissed the provider's request for a hearing. There was no regulation or agency policy that directed the provider not to claim these costs on its cost report. Therefore, the PRRB's decision dismissing the provider's hearing request on the two claims was affirmed.

See ¶ 7715.75.

#### [Text of Decision]

This case is before the Administrator, Health Care Financing Administration, for review of the Provider Reimbursement Review Board's dismissal of the Provider's request for a hearing. The review is during the period provided by Sec. 1878(f)(1) of the Social Security Act, as amended (42 USC 1395oo]. Comments were received from the Provider seeking reversal of the Board's denial of jurisdiction. The parties were notified that this case would be before the Administrator and of their right to submit comments during the course of review. No comments were received from the Intermediary and the time for submitting them has passed. Accordingly, this case is before the Administrator for final agency review.

#### Issue and Board's Decision

The issue is whether the Board has jurisdiction over issues involving costs which were not claimed by the Provider on its cost report. The types of costs at issue here are not prohibited by either Medicare policy or regulations.

The Board denied jurisdiction over these claims for advertising costs[1] and Medicare bad debts because the Provider "self-disallowed" those costs. The Provider had based its appeal on the holding of the Supreme Court in *Bethesda Hospital v. Bowen,* 485 U.S. 399 (1988). The Supreme Court held that a provider, not claiming certain costs on its cost report, because the regulations prohibited reimbursement for such costs, was entitled to a hearing on those costs in order to challenge the regulation. The Board distinguished this case from *Bethesda,* in that there were **no regulations** denying reimbursement. The Intermediary was authorized to allow the claimed **costs.** Therefore, the Provider was required to **present** its claim and receive a determination from the Intermediary as a prerequisite to a Board hearing.

#### Summary of the Provider's Comments

The Provider commented that the Board had jurisdiction because, even though no formal claims were made on the cost report, the Provider did bring the costs to the Intermediary's attention. The claim involving owner's compensation was referenced in other work papers, and the Provider asked the Intermediary for instructions on claiming approximately $78,000 of Medicare bad debts. Receiving no response, the Provider withheld the claim from the cost report.

#### Discussion

The entire record which was furnished by the parties has been examined. The Board's dismissal has been carefully reviewed by the Administrator. All comments received after entry of the Board's action have been made a part of the record and considered. The statement of facts set forth by the Board is incorporated by reference.

The Administrator, after review of the record, the comments, and the relevant law, regulations, and governing criteria, finds that the Board acted properly in dismissing the Provider's request for a hearing. In this case, the Provider did not claim on its cost report reimbursement for certain owner's compensation and Medicare bad debts. There was no regulation or other agency policy that directed the Provider not to claim these costs on its cost report.

On the contrary, both of these costs are expressly permitted by the regulations. 42 CFR 413.102 (formerly 405.426) allows as a reimbursable cost reasonable compensation for the necessary services performed by owners. 42 CFR 413.80 (formerly 405.20) authorizes reimbursement for bad debts attributable to the failure of Medicare beneficiaries to pay the deductible and coinsurance amounts related to covered services.

With respect to Medicare bad debts, there is a section of the cost report that is expressly set aside for claiming this cost: Schedule C, Part II, entitled "Calculation of Reimbursable Bad Debt." On the Provider's cost report at issue here, this part was left completely blank. The Provider asserts that, after it asked the Intermediary for instructions on how to claim these costs, the Intermediary essentially directed the

---

[1] Originally recorded by the Provider as a loan from the advertising account to the Provider's owner for foreign travel, the Provider has attempted to recharacterize these costs as additional owners compensation.

**¶ 38,661**

©1990, Commerce Clearing House, Inc.

23

EXHIBIT __L__

New Developments **23,817**

Provider to omit them from the cost report. The Administrator finds this explanation provides no excuse for the Provider's failure to claim the bad debts on the cost report. Readily available, public instructions have been issued in Chapter III of the *Provider Reimbursement Manual* (HIM-15) to provide guidance on claiming and calculating the bad debts that are reimbursable under the Medicare program.

Under the process established by Congress for review of reimbursement disputes, the intermediary's determination is required for PRRB review in order to give effect to the time limits for the filing of cost reports. Instead of being required to file within three months, with a maximum extension of 30 days, as required by 42 CFR 413.24(f)(2), a provider could file new cost claims for as long as its appeal as to any claim was pending before the PRRB. Elimination of the intermediary's initial determination is also contrary to the statutory design, because

the PRRB then becomes the body making *de novo* reimbursement determinations, rather than a reviewing body.

In this case, the Provider did not claim on its cost report reimbursement for Medicare bad debts and certain owners compensation. The Provider did not refrain from claiming these costs because of a regulation or other program policy. Therefore, the Provider is now precluded from claiming those costs at the PRRB.

*Decision*

The action of the Provider Reimbursement Review Board dismissing the Provider's request for a hearing on the two claims at issue is affirmed.

This constitutes the final administrative decision of the Secretary of Health and Human Services

---

**[¶ 38,662]   Fayette Memorial Hospital Association v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Indiana.**

*HCFA Administrator Decision,* Aug. 16, 1990.

## Medicare: Abandoned Planning Costs

**Provider reimbursement—Cost related to patient care—Cost data and cost finding—Abandoned planning costs.**—An intermediary properly classified a hospital's abandoned planning costs as administrative and general costs instead of capital-related expenses. *Manual* Sec. 2154.4 provides that abandoned planning costs may be included in allowable costs either in the year of abandonment or by amortizing them over a three-year period. At most, these costs should have been expensed within a three-year period, but not capitalized. Therefore, the Board's decision is reversed.

See ¶ 5999W-28.

**PRRB Dec. No. 90-D38 (Guide ¶ 38,598) is reversed.**

### [Text of Decision]

This case is before the Administrator, Health Care Financing Administration, for review of the decision entered by the Provider Reimbursement Review Board. The review is during the 60-day period in Sec. 1878(f)(1) of the Social Security Act, as amended [42 USC 1395oo(f)]. The Intermediary submitted comments requesting reversal. The parties were notified of the Administrator's intention to review the Board's decision. The Provider submitted comments requesting affirmation. Accordingly, the case is now before the Administrator for final administrative decision.

*Issue and Board's Decision*

The issue is whether the Intermediary properly classified the Provider's abandoned planning costs as administrative and general costs instead of capital-related expenses. The majority of the Board reversed the Intermediary and held that the abandoned planning costs should be classified as capital-related expenses. The majority stated that since the planning costs were

incurred for a proposed capital project, the nature of the costs did not change simply because the project was then abandoned. Further, the majority found that under 42 CFR 405.415(f)(1) [1], these planning costs were related to the expansion and renovation of the existing hospital building, a depreciable asset. Therefore, when the plans were abandoned they then represented a loss on the disposal of a depreciable asset which is a capital-related cost.

The Chairman and one Board member dissented, finding that the Medicare program has defined and specifically identified capital-related costs. Abandoned planning costs are not included as capital-related costs. Further, the members stated that in order for a cost to be capital-related, there has to be a tangible asset to attach such costs. The Chairman further disagreed with the majority's conclusion that since the planning costs were related to a depreciable asset the costs were capital-related.

The Chairman wrote that the regulation, 42 CFR 405.415(f), cited by the majority,

---

[1] Redesignated at 42 CFR 413.134.

**¶ 38,662**

24   EXHIBIT